534 F.2d 1115
 Veronica LEWIS, Individually etc., et al., Naomi Barry
Pottinger, Individually, etc., et al., Vincent Lewis et al.,
Daisy Llewellyn et al., and Margaret Clark, Individually,
etc., et al., Plaintiffs-Appellees,
v.
S. S. BAUNE et al., Defendants-Appellants.
In the Matter of SKIBS A/S BAUMARE and Torvald Klaveness, as
Owner andManaging Owner of the S/S BAUNE,
Petitioning for Exoneration from or
Limitationof Liability,
Plaintiffs-Appellants,
v.
Phyllis HOYT et al., Claimants-Appellees.
 No. 75-3339.
 United States Court of Appeals,
Fifth Circuit.
 July 6, 1976.
 
 Benjamin W. Yancey, William E. Wright, New Orleans, La., for defendants-appellants.
 Paul H. Due, Baton Rouge, La., Benton Musslewhite, Houston, Tex., for plaintiffs-appellees.
 Thomas H. Leach, New Orleans, La., for Shell Oil.
 Warren M. Faris, New Orleans, La., for Keystone.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before COLEMAN, RONEY and TJOFLAT, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 
 1
 This is an appeal from a permanent injunction and a conviction of contempt for violating an earlier temporary restraining order issued by the District Court. We reverse.[1]Facts
 
 
 2
 The genesis of this case was a ship collision between the Norwegian Steamship BAUNE and the American Steamship KEY TRADER in the Mississippi River on January 18, 1974, in which several Jamaican seamen were killed. In Jamaica, four days after the collision, various family members and alleged dependents of the deceased seamen signed contingency fee employment contracts[2] with the Baton Rouge law firm of Due and Dodson.
 
 
 3
 On January 30, 1974, Due and Dodson filed five suits in the district court in New Orleans, naming as defendants the owners of both vessels and their alleged insurers. The suits were for damages in admiralty under the general maritime law, for unseaworthiness, for damages under the Jones Act and for loss of wages.
 
 
 4
 Various representatives for the Norwegian ship, S.S. BAUNE, on which the Jamaican seamen had served, contacted the Jamaican claimants and attempted, unsuccessfully, to negotiate a settlement of the claims. Upon learning of this, Due and Dodson wrote the shipowners and their Norwegian attorney, Oystein Ore, then in Jamaica, informing them of their contracts with the Jamaican claimants and requesting that the defendants not communicate with their clients. The same information was also conveyed by telegram. Ore testified that he received the telegram on January 30, 1974, and thereafter never discussed settlement with any persons named in the telegram. Due and Dodson, however, were informed that certain agents of the BAUNE were still attempting to contact their clients so, on February 7, they filed a motion in the pending admiralty suit for injunctive relief. On March 6, 1974, the District Court held a brief hearing on the motion and decided to grant the temporary restraining order. The order of the District Court reads as follows:
 
 
 5
 IT IS ORDERED that a temporary restraining order issue herein, . . . directed to S.S. Baune, Torvald Klaveness, Skibstieselskapet Baumare (SKIBS A/S BAUMARE), their agents, attorneys, representatives and all other persons acting or purporting to act on their behalf, restraining, enjoining and prohibiting them from contacting, communicating, or in any way interfering with the attorney-client relationship of the above named plaintiffs and their attorneys, Due and Dodson, and from discussing, directly or indirectly, settlement of said matters with the plaintiffs.
 
 
 6
 The TRO was extended by consent of the parties ten times and was in full force and effect when on March 7, 1975, the Jamaican claimants together with their attorneys, Due and Dodson, "in proper person", filed a motion for contempt, ordering the defendants to show cause why they should not be adjudged in contempt of court for disobeying the TRO.
 
 
 7
 On April 10, 1975, the District Court held a hearing on plaintiffs' motion for a preliminary and permanent injunction and on their motion for contempt, all of which were granted. The District Court found that persons, acting as agents for the Norwegian shipping company, on seven occasions during the life of the restraining order, did unilaterally and directly contact various claimants who were clients of Due and Dodson in contravention of the outstanding temporary restraining order.[3] The Court awarded to attorneys Due and Dodson expenses in the sum of $10,966.71 and attorney fees in the amount of $9,100. The Court then awarded to the plaintiffs and their counsel "punitive damages" in the sum of $50,000.[4] The permanent injunction issued by the Court utilized the same language contained in the temporary restraining order.
 
 
 8
 The appellants challenge the validity of the TRO, with a broadside attack on the District Court's jurisdiction and the propriety of the order.
 
 Preliminary Considerations
 
 9
 Of course, parties, generally, should always obey court orders regardless of whether they think the orders are correct. The proper method of challenging such an order is by appeal, not by disobedience, Maness v. Meyers, 1975, 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574. By violating a court order, even one later set aside as incorrect, a person runs the risk of being held in criminal contempt, Maness v. Meyers, supra; United States v. Dickinson, 5 Cir. 1972, 465 F.2d 496, on remand, 349 F.Supp. 227, affirmed on second appeal, 5 Cir., 476 F.2d 373, cert. denied, 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223.
 
 
 10
 When a person is adjudged in contempt of court, the first essential is to determine the nature of the proceeding, i. e., whether the contempt is civil or criminal. Proceedings by way of criminal contempt are to punish defiance of judicial authority, whereas civil contempt serves to compel obedience of the court order or to compensate the litigant for injuries suffered because of the disobedience, Norman Bridge Drug Company v. Banner, 5 Cir. 1976, 529 F.2d 822, 827; 7 Moore's Fed. Practice P 65.02(4). So, if a person is held in criminal contempt for violating a restraining order, the fact that the order is later set aside as incorrect will not effect the judgment of contempt; the purpose there is vindication of the court's authority, United States v. United Mine Workers, 1947, 330 U.S. 258, 294, 67 S.Ct. 677, 91 L.Ed. 884. A judgment of civil contempt, being remedial in nature, stands or falls with the validity or invalidity of the order, and the opposing party should be compensated only if he was entitled to the order, United States v. United Mine Workers, supra, 330 U.S. at 295, 67 S.Ct. at 696; Norman Bridge Drug Company v. Banner, supra, 529 F.2d at 828.
 
 
 11
 In the case at bar, the trial court, in its conclusions of law, denominated the proceedings as civil contempt. A court's characterization of its proceedings is a factor to be considered in determining the character of a contempt, although it is not conclusive, Southern Railway Company v. Lanham, 5 Cir. 1968, 403 F.2d 119, 124. The contempt case was initiated and prosecuted by the Jamaican claimants and their attorneys; the government as a representative of the court was not a party. The "punitive damages" assessed against the appellants were awarded to the appellees as "some compensation for the ordeal and anxiety through which they were put," and were not payable to the Court. Were we unable to determine whether this judgment of contempt was of a civil or criminal nature, we would have to reverse on that ground. No judgment of contempt that is unclear as to its civil or criminal nature will be allowed to stand, In re Monroe, 5 Cir. 1976, 532 F.2d 424; Skinner v. White, 5 Cir. 1974, 505 F.2d 685. Considering all the above factors, we have little doubt that though the Court imposed what it called a "punitive sanction", the nature and purpose of these proceedings fall clearly within a classification of civil contempt. Therefore, the penalties for contempt must stand or fall with the temporary restraining order.
 
 Jurisdiction
 
 12
 Appellants assert that for two reasons the District Court had no jurisdiction ab initio to issue a TRO: first, the motion for the TRO set up an unrelated, separate cause of action from the pending admiralty suit, thus no independent jurisdictional basis existed; secondly, a court sitting in admiralty is without power to issue injunctive relief to a litigant.
 
 
 13
 Since all parties, plaintiffs and defendants, are aliens, there is no diversity of citizenship. We believe, however, that the injunctive aspect of this case is closely enough related to the suit in admiralty as to come within the ancillary jurisdiction of the court.
 
 
 14
 Once a court has obtained jurisdiction of a cause of action, it is entitled to retain the action and to grant complete relief as to any matter which is incidental thereto, even though the court may not have had jurisdiction over such auxiliary matter if it had been asserted as an independent cause of action. Sheridan v. United Brotherhood of Carpenters, Etc., D.Del.1961, 191 F.Supp. 347, 353.
 
 
 15
 In discussing the concept of ancillary jurisdiction we stated in Revere Copper & Brass, Inc. v. Aetna Casualty & Surety Company, 5 Cir. 1970,426 F.2d 709, 714 that an ancillary claim must bear a "logical relationship to the aggregate core of operative facts which constitutes the main claim over which the court has an independent basis of federal jurisdiction." We believe that the injunctive action bears a "logical relationship" to the pending admiralty suit and is properly within the ancillary jurisdiction of the Court.[5]
 
 
 16
 Appellants' second jurisdictional attack is that an admiralty court is not a court of equity and is therefore without power to issue an injunction. Indeed, several courts have so held, e. g., Carroll v. Protection Maritime Insurance Co., Ltd., 1 Cir. 1975, 512 F.2d 4, 9; Khedivial Line, S.A.E. v. Seafarers' International Union, 2 Cir. 1960, 278 F.2d 49; Marine Cooks & Stewards, AFL v. Panama Steamship Co., Ltd., 9 Cir. 1959, 265 F.2d 780, 784-85, rev'd on other grounds, 1960, 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797; Sound Marine & Machine Corp. v. Westchester County, 2 Cir. 1938, 100 F.2d 360, cert. denied, 1939, 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042; Streckfus Steamers v. Mayor and Aldermen, 5 Cir. 1936, 81 F.2d 298; Nyon Technical Commercial, Inc. v. Equitable Equipment Co., E.D.La.1972, 341 F.Supp. 777. But this dogma has been strenuously criticized as irrational, Morrison, The Remedial Powers of the Admiralty, 43 Yale L.J. 1 (1933); Zobel, Admiralty Jurisdiction, Unification, and the American Law Institute, 6 San Diego L.J. 375, 394 (1969); Gilmore & Black, The Law of Admiralty, § 1-14 p. 37 (1957). As pointed out by the court in McKie Lighter Company v. City of Boston, D.Mass.1971, 335 F.Supp. 663, 666-67, the courts that have stated that an admiralty court has no power to issue injunctions have relied too strongly on Justice Butler's dicta in Schoenamsgruber v. Hamburg American Line, 1935, 294 U.S. 454, 457-58, 55 S.Ct. 475, 477, 79 L.Ed. 989 ("While courts of admiralty have capacity to apply equitable principles . . . they do not issue injunctions").
 
 
 17
 As later Supreme Court cases have stated, "(e)quity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief," Vaughn v. Atkinson, 1962, 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (equitable award of counsel fees in maintenance and cure action).
 
 
 18
 In Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206, where the Court held that a court of admiralty, having jurisdiction of a claim for cargo loss, could in the exercise of its admiralty jurisdiction, examine an alleged fraudulent transfer of property, Mr. Justice Frankfurter wrote:
 
 
 19
 To deny an admiralty court jurisdiction over this subsidiary or derivative issue in a litigation clearly maritime would require an absolute rule that admiralty is rigorously excluded from all contact with nonmaritime transactions and from all equitable relief, even though such nonmaritime transactions come into play, and such equitable relief is sought, in the course of admiralty's exercise of its jurisdiction over a matter exclusively maritime. It would be strange indeed thus to hobble a legal system that has been so responsive to the practicalities of maritime commerce and so inventive in adapting its jurisdiction to the needs of that commerce.
 
 
 20
 We find no restriction upon admiralty by chancery so unrelenting as to bar the grant of any equitable relief even when that relief is subsidiary to issues wholly within admiralty jurisdiction. 339 U.S. at 691-92, 70 S.Ct. at 866.
 
 
 21
 Whatever may have been the extent of the equitable power of an admiralty court to issue injunctions prior to the 1966 unification of admiralty and other civil actions, there should be little doubt today that courts of admiralty, in proper cases, may invoke the equitable tool of injunction, see McKie Lighter Company v. City of Boston, supra; Rule 1, F.R.Civ.P; 14 Wright & Miller, Fed. Practice & Procedure § 3671 at 273 (1976); Colby, Admiralty Unification, 54 Geo.L.J. 1258, 1268 (1966). We stated in Stern, Hays & Lang, Inc. v. M/V Nili, 5 Cir. 1969, 407 F.2d 549, 551:
 
 
 22
 The melding of the civil with admiralty does more than obliterate the cherished hoary title of proctor. It invests the Judge with all of the statutory powers, whether their genesis be formerly at law, in equity, or in admiralty.
 
 
 23
 We see no reason why the injunctive powers contained in Rule 65, F.R.Civ.P., should be prohibited to the district court sitting in admiralty. In the eloquent prose of our Chief Judge Brown:
 
 
 24
 The Chancellor is no longer fixed to the woolsack. He may stride the quarter-deck of maritime jurisprudence and, in the role of admiralty judge, dispense, as would his landlocked brother, that which equity and good conscience impels.
 
 
 25
 Compania Anonima Venezolana De Nav. v. A. J. Perez Exp. Co., 5 Cir. 1962, 303 F.2d 692, 699, cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (footnote and citations omitted).
 
 
 26
 We believe that all courts, both seagoing and landlocked, have inherent power, within certain limits, to control the conduct of the parties who have subjected themselves to the jurisdiction of the courts. Injunctive relief, where warranted, can be a useful tool to aid a court in controlling the conduct of litigants. However, merely because the court has power, it does not necessarily follow that any and all exercises of such power are proper.
 
 Propriety of Injunctive Relief
 
 27
 We note that the TRO here was issued after notice and a brief hearing, and was in effect for approximately one year. It was in substance and effect a preliminary injunction and we therefore view it as such, Dilworth v. Riner, 5 Cir. 1965, 343 F.2d 226, 229; see Sampson v. Murray, 1974, 415 U.S. 61, 86-88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166; National Mediation Board v. Air Line Pilots Ass'n, 1963, 116 U.S.App.D.C. 300, 323 F.2d 305.
 
 
 28
 The finding prior to issuance, most essential to a preliminary injunction, is that the failure to grant it will result in irreparable injury to the person requesting the relief, see Sampson v. Murray, supra, 415 U.S. at 88, 94 S.Ct. at 952; 11 Wright & Miller, Fed.Practice & Procedure § 2948 at 431 (1973). An injunction is an extraordinary remedy and should not issue except upon a clear showing of possible irreparable injury, see Berrigan v. Norton, 2 Cir. 1971, 451 F.2d 790, 793.
 
 
 29
 Appellant strongly urges that parties to a lawsuit have an absolute right to settle their suit and that a court can not enjoin them from settling. Unquestionably the settlement of litigation and the compromise of disputed claims are favored by the courts, e. g. Williams v. First National Bank, 1910, 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625; Maulding v. Louisville & N. R. Co., 7 Cir. 1948, 168 F.2d 880, 882; Clark v. Barlow, 1941, 74 App.D.C. 328, 122 F.2d 337, 341, cert. denied, 314 U.S. 675, 62 S.Ct. 188, 86 L.Ed. 540. Courts have consistently held that parties have a right to settle or compromise their litigation without the knowledge or consent of their counsel, The Golden Star, 9 Cir. 1936, 82 F.2d 687; German v. Universal Oil Products Co., 8 Cir. 1935, 77 F.2d 70, 72; Byram v. Miner, 8 Cir. 1931, 47 F.2d 112, 117, cert. denied, 283 U.S. 854, 51 S.Ct. 648, 75 L.Ed. 1461; In Re Baxter & Co., 2 Cir. 1907, 154 F. 22; Swanson v. Chicago, St. P. & K. C. Ry. Co., 8 Cir. 1888, 35 F. 638; Swanston v. Morning Star Mining Co., 8 Cir. 1882, 13 F. 215; Katopodis v. Liberian S/T Olympic Sun, E.D.Va.1968, 282 F.Supp. 369, 371; Monsanto Chemical Co. v. Grandbush, W.D.Ark.1958, 162 F.Supp. 797, 802; Ruck v. Spray Cotton Mills, M.D.N.C.1954, 120 F.Supp. 944, 947; Bennett v. Sinclair Nav. Co., E.D.Pa.1940, 33 F.Supp. 14. Clauses in a contract between attorney and client which prohibit a settlement by the client without his attorney's consent are generally held to be unenforceable as against public policy,Purvis v. United States, 8 Cir. 1932, 61 F.2d 992; Annot. 121 A.L.R. 1122 (1939). But see LSA-R.S. 37:218 (Supp.1976) (Louisiana statute permits stipulation in contract that neither attorney nor client may settle without written consent of the other).
 
 
 30
 We would not go so far as to say that parties have an absolute right to settle behind the backs of counsel. Parties certainly do not have a right to obtain a settlement through duress, harassment, or overbearing conduct. The power of courts to enjoin harassment or repeated invasions of privacy is recognized, Bivens v. Six Unknown Named Agents of Fed. Bur. of Nar., 2 Cir. 1969, 409 F.2d 718, 725, rev'd on other grounds, 1971, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619; Galella v. Onassis, S.D.N.Y.1972, 353 F.Supp. 196, modified, 2 Cir. 1973, 487 F.2d 986. But see, Alberti v. Cruise, 4 Cir. 1967, 383 F.2d 268. There is no reason the recurrent harassing conduct of a party in pursuit of a settlement may not be enjoined. But the injunction here did not speak to such conduct. It prohibited appellant from "discussing, directly or indirectly, settlement . . . with the plaintiffs" and from "contacting, communicating, or in any way interfering with the attorney-client relationship". What the District Court in effect enjoined was a settlement between the parties, however amicably reached, if the claimants' attorneys were not consulted.[6] This was too sweeping a restraint by the lower court.
 
 
 31
 Our research has revealed no case in which a court enjoined a settlement between the parties of a disputed claim. There have been cases where such an injunction was sought but, for various reasons, was denied, see MacLeod v. Vest Transportation Company, N.D.Miss.1964, 235 F.Supp. 369; Raabe v. Universe Tankships, S.D.N.Y.1966, 263 F.Supp. 786; Karuse v. Hartford Accident & Indemnity Co., 1951, 331 Mich. 19, 49 N.W.2d 41.
 
 
 32
 A settlement reached by parties, even sans attorneys, would not create irreparable injury per se.
 
 
 33
 Appellees concede that there is no irreparable injury to attorneys Due and Dodson, since they would have an adequate remedy at law to obtain any fees due them were the parties here to settle.[7] They contend, however, that the Jamaican claimants would be irreparably injured without an injunction since they might succumb to the offers of appellants and settle their suits for only a small percentage of their actual worth.
 
 
 34
 No one would argue about the fact that there exists a great inequality in bargaining strength between the huge shipping corporation and the indigent and unsophisticated claimants. This inequality is exacerbated by the defendants' circumventing the claimants' attorneys whose purpose, among other things, is to equalize the respective bases of bargaining strength between the parties and see that any settlement which may be reached is fair and equitable. But we are not convinced that the extraordinary remedy of injunction is the proper method of dealing with the problem. We think that the power to set aside any settlement gained by overbearing conduct, duress, or coercion, fraud, or overreaching militate against a finding of irreparable injury and preclude the district court's resort to the equitable remedy of injunction in a case of the kind we now have before us.
 
 
 35
 Since a seaman is a ward of the admiralty, a settlement agreement executed by a seaman will be subjected to a careful scrutiny by the courts, Garrett v. Moore-McCormack Company, 1942, 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239. The test by which a seaman's release is judged was set out in Garrett v. Moore-McCormack Company, supra, 317 U.S. at 248, 63 S.Ct. 252, as follows:
 
 
 36
 . . . the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with a full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding.
 
 
 37
 We have applied this test in several cases and refused to enforce the settlement agreement because we found the release to be unjust, Gueho v. Diamond M. Drilling Co., 5 Cir. 1975, 524 F.2d 986; Blanco v. Moran Shipping Company, 5 Cir. 1973, 483 F.2d 63; Cates v. United States, 5 Cir. 1971, 451 F.2d 411. This strict scrutiny extends to settlements made by relatives of seamen, see Hassan v. A. M. Landry & Son, Inc., 5 Cir. 1963, 321 F.2d 570, cert. denied, 1964, 375 U.S. 967, 84 S.Ct. 486, 11 L.Ed.2d 416.
 
 
 38
 While there is no purpose here of condoning any attempt of the BAUNE agents to settle behind the backs of the claimants' attorneys, there is no showing that they engaged in any oppressive conduct, either before or after the restraining order.[8]
 
 
 39
 We are of the opinion that the appellees presented no evidence to the District Court from which it could have found that irreparable injury would occur without an injunction. Consequently, the restraining order was improperly entered. The appellees, having no right to preliminary injunctive relief, have no right to the monies derived from the civil contempt proceeding.
 
 
 40
 In not all cases where the petitioner fails to show irreparable injury will he still be denied a permanent injunction, see e. g., Port of New York Authority v. Eastern Air Lines, Inc., E.D.N.Y.1966, 259 F.Supp. 745. Whereas the essential finding that must be made to issue a TRO or preliminary injunction is irreparable injury, the essential prerequisite to a permanent injunction is the unavailability of an adequate remedy at law. Irreparable injury is, however, one basis, and probably the major one, for showing the inadequacy of any legal remedy, see 11 Wright & Miller, Fed.Practice & Procedure § 2944 at 399-401 (1973). Often times the concepts of "irreparable injury" and "no adequate remedy at law" are indistinguishable. The court in Bannercraft Clothing Co. v. Renegotiation Board, 1972, 151 U.S.App.D.C. 174, 466 F.2d 345, rev'd 1974, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123, acknowledged the frequent indistinguishability but went on to say: "the irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury". 466 F.2d at 356 n. 9.
 
 
 41
 The facts of the instant case, whether gauged by the touchstone of "irreparable injury" or "inadequate remedy at law" reveal but one result, insufficient justification of injunctive relief, both preliminary and permanent. The conduct sought to be enjoined was not the type of conduct that would cause any great injury, certainly not irreparable injury. Furthermore, the close scrutiny given to a settlement by a seaman and the plenary power of a court to set aside a settlement that it deems unjust, provide the appellees with a clear and adequate remedy at law.
 
 
 42
 Therefore, the judgment of the District Court granting the permanent injunction and holding the appellants in civil contempt is
 
 
 43
 REVERSED.
 
 
 
 [1]
 This appeal involves two cases. In the second case (Phyllis Hoyt, appellee) the appellant, Baune, is appealing from the District Court's grant of a permanent injunction which prohibits them from "contacting and attempting to negotiate" a settlement with the claimants without the presence of claimants' attorney. This case involves no contempt. As in the first case (Veronica Lewis, et al., appellees), the Hoyt case does not present a probability of irreparable injury or the unavailability of an adequate remedy at law; therefore, the District Court abused its discretion in granting the injunction and its judgment is reversed
 
 
 [2]
 The contracts provided that the attorneys would receive a fee of 331/3% of any settlement made prior to institution of suit, 40% of settlement, verdict or recovery obtained after instituting suit, and 50% if the action was appealed. The contract also provided that neither the client nor Due and Dodson had "the right, without consent of the other, to settle, compromise, release, discontinue, or otherwise dispose" of the suit
 
 
 [3]
 The Court's findings of fact also determined that one of the claimants went to see an agent of the shipping company at his home in Jamaica and discussed settlement while there, and that agents of the company went to discuss settlement of the claims on one final occasion at the request of one of the claimants
 
 
 [4]
 The Court did not state in what proportions the $50,000 should be disbursed among the movants
 
 
 [5]
 The concept of ancillary jurisdiction is recognized in federal admiralty courts, see, e. g., Leathers Best, Inc. v. S.S. Mormaclynx, 2 Cir. 1971, 451 F.2d 800; Beverly Hills National Bank & Trust Company v. Compania De Navegacione Almirante, S.A. Panama, 9 Cir. 1971, 437 F.2d 301, cert. denied, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161
 
 
 [6]
 It could be persuasively argued that the literal language of the District Court's injunction prohibits any type of settlement between the parties even if the attorneys were present. A reading of the record indicates that the District Court only intended to prevent the shipping company from discussing a settlement of the suit in the absence of the claimants' attorneys. The injunction in the Hoyt case clearly only restrained the appellant from attempting to settle with the claimant "without the presence and/or knowledge and consent of her attorneys"
 
 
 [7]
 See App. Vol. I, p. 143. Settlement will not destroy the attorney's right to his fee, see LSA-R.S. 37:218 (Supp.1976); Katopodis v. Liberian S/T Olympic Sun, E.D.Va.1968, 282 F.Supp. 369; Bennett v. Sinclair Nav. Co., E.D.Pa.1940, 33 F.Supp. 14; Annot. 26 A.L.R.3d 679 (1969)
 
 
 [8]
 The affidavit of Richard J. Dodson shows that before the TRO was issued Marcelle Llewellyn was approached with offers of settlement on two occasions. The affidavit further alleges that clients Hyacinth Tracey, Vincent Lewis, Veronica Lewis and Naomi Pottinger were approached with offers of settlement but does not detail any of the particulars other than to state that Naomi Pottinger was offered $40,000 then subsequently $55,000. App. Vol. I, pp. 109-113
 During the one year life of the TRO, the District Court found that agents of the Baune unilaterally contacted various claimants on seven occasions. Daisy Llewellyn was contacted three times, Hyacinth Tracey and Veronica Lewis twice, and Maurice Llewellyn and Naomi Pottinger once. See App. Vol. II, pp. 707-713. All offers of settlement were rebuffed.